**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Oct 29 2014, 9:33 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**DAVID L. TAYLOR**
**ANDREW T. PADGETT**
Taylor Law Firm, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**MARK K. DUDLEY**
Howard Deley & Dudley, LLP
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| AUTO-OWNERS INSURANCE COMPANY, | ) | |
| | ) | |
| Appellant/Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 18A05-1403-PL-107 |
| | ) | |
| EDWARD FOSTER, | ) | |
| | ) | |
| Appellee/Defendant. | ) | |

### APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Kimberly S. Dowling, Judge
Cause No. 18C02-1005-PL-11

**October 29, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

In 2009, a Honda Accord driven by Garrett Gaddis struck and seriously injured Appellee-Defendant Edward Foster, who was riding a bicycle. Approximately a month before, Garrett had executed a bill of sale for the Accord from Bill Gaddis Chrysler Dodge ("the Dealership") and took possession of the Accord. Garrett was issued a temporary license plate for the Accord and purchased the Accord through his father, Scott Gaddis, who worked for the Dealership at the time. Scott was to pay for the Accord from his employee account over time, and Garrett was to pay Scott back. At the time of the sale, Garrett paid Scott $200.00 toward the $500.00 purchase price. At the time of the accident, Garrett was driving the Accord without permission after Scott had taken the keys as a disciplinary measure. Following the accident, Scott took the Accord from Garrett and had the Dealership sell it at auction, and the Dealership retained the proceeds.

In this insurance coverage case, Appellant-Plaintiff Auto-Owners Insurance Company appeals from the trial court's judgment that it has a duty to defend and indemnify the Dealership because the dealership actually owned the Accord at the time of the accident and that Garrett was driving it with the Dealership's implied permission. Because we conclude that the trial court's conclusions that the Dealership owned the Accord at the time of the accident and that Garrett was permissively driving it, we affirm.

## FACTS AND PROCEDURAL HISTORY

In late 2008 and early 2009, the Dealership in Muncie was owned by Bill Gaddis and employed, among others, Bill's sons Steve and Scott as manager and a salesman, respectively. Scott resided with his son Garrett in a house next to the Dealership. On

2

December 15, 2008, Garrett and the Dealership executed a bill of sale for a 1996 Honda Accord for a total price of $500.00, plus tax. The Dealership issued a temporary paper license plate to Garrett for the Accord. Garrett made a down payment of approximately $200.00 cash to Scott, who put the Accord on his employee account, through which the Accord would be paid for by paycheck deductions over time. The arrangement between Scott and Garrett was that Garrett was to repay Scott the balance, also over time. Dealership records do not indicate that the Accord was ever put on Scott's account or that the Dealership paid sales tax.

At the time, Auto-Owners provided coverage to the Dealership pursuant to a Garage Liability Policy ("the Policy") with policy terms from December 1, 2008, to December 1, 2009. (Policy 1). Pursuant to the terms of the Policy, Auto-Owners "will … pay damages for **bodily injury** and **property damage** for which the **insured** becomes legally responsible because of or arising out of … An **auto** or **farm implement** … Owned by **you**[.]" Exhibit Vol. p. 335. The Policy also provided the following:

> **SECTION III – WHO IS AN INSURED**
> ….
> B.    With respect to any **auto** or **farm implement** as described under **SECTION II – COVERAGE, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. COVERAGE, b. Bodily Injury and Property Damage Liability**, only
> 1.    **You**.
> 2.    **Your garage customers**.
> 3.    Any other person or organization using an **auto** or **farm implement** with **your** permission.

Exhibit Vol. pp. 350-51.

3

At some point before January 29, 2009, Scott took the keys to the Accord away from Garrett as a disciplinary measure. The Accord was parked on the Dealership's lot. On January 29, 2009, Garrett, who had found the hidden keys, was driving the Accord without permission when he struck and seriously injured Foster, who was riding a bicycle. Following the accident, Scott took the Accord away from Garrett and had Steve sell it at auction for $1465.00, with the Dealership retaining all of the proceeds.

On May 26, 2009, Foster filed suit against Garrett, alleging negligence. On May 17, 2010, Auto-Owners filed a suit for declaratory judgment against Foster, Garrett, and the Dealership seeking a judgment that it had no duty to defend or indemnify Garrett pursuant to the Policy or a separate Commercial General Liability policy.[1] On May 25, 2011, Auto-Owners moved for summary judgment, which motion the trial court denied on September 22, 2011. The matter was certified for interlocutory appeal. On August 29, 2012, this court issued its published opinion, in which we held, *inter alia*, that genuine issues of material fact existed regarding (1) whether Garrett or the Dealership owned the Accord at the time of the accident and (2) if the Dealership owned the Accord, whether Garrett was a permissive driver. *See Auto-Owners Ins. Co. v. Bill Gaddis Chrysler Dodge, Inc.*, 973 N.E.2d 1179, 1184-85 (Ind. Ct. App. 2012), *trans. denied*.

On December 9, 2013, trial was held to the bench on the questions of who owned the Accord at the time of the accident and whether, if owned by the Dealership, Garrett was driving it with permission. On February 18, 2014, the trial court issued its judgment,

---

[1] At some point, the parties agreed that there was no coverage available pursuant to the Commercial General Liability policy.

in which it found that (1) the dealership owned the Accord at the time of the accident and (2) Garrett was driving the Accord with the Dealership's implied permission. The trial court's judgment reads as follows:

### JUDGMENT

Comes now the Court, and the Plaintiff having appeared by Representative Darrin Earley and by counsel, and Defendant Edward Foster having appeared by counsel on the 9th day of December, 2013 for trial. Evidence was heard and concluded and counsel was given until December 23, 2013 to present trial briefs. Trial briefs have been received from both counsel, and the Court took this matter under advisement. The Court now being duly and sufficiently advised, finds as follows:

1. Bill Gaddis Chrysler Dodge, Inc. ([the Dealership]) and Garrett Gaddis were both previously disposed of in this case.
2. Edward Foster remains as the sole Defendant in this cause.
3. Auto-Owners Insurance Company (Auto-Owners) issued a Garage Liability Policy to Bill Gaddis Chrysler Dodge, Inc.
4. Garrett Gaddis, at the time of this accident, lived with his father, Scott Gaddis.
5. Scott Gaddis, at or near the time of this accident, was a salesman at Gaddis.
6. Garrett Gaddis' grandfather, Bill Gaddis, owned Bill Gaddis Chrysler Dodge, Inc.
7. On January 29, 2009, Garrett Gaddis was driving a 1996 Honda Accord and caused an accident with Defendant Edward Foster.
8. Plaintiff, Auto-Owners filed their Complaint for Declaratory Judgment against [the Dealership], Garrett Gaddis and Edward Foster.
9. The ultimate issues in this case are who owned the 1996 Honda Accord (Honda) that Garrett Gaddis was driving at the time of the accident, and, if [the Dealership] owned the car, did [the Dealership] give Garrett Gaddis permission to drive it.
10. The Court will address the ownership question first.
11. This is not a clear cut issue. There are facts that support both sides of the ownership issue.
12. Auto-Owners, Bill Gaddis, Scott Gaddis, Garrett Gaddis, and Steve Gaddis (Bill's other son and the minority owner of [the Dealership]) all take the position that Garrett owned the Honda at the time of the accident.
13. Garrett went through his father, Scott, to purchase the Honda.

5

14. Family members, including Scott Gaddis, had accounts with the dealership through which they purchased vehicles, and had repairs done to their vehicles.

15. Defendant's Exhibit B is the account statement for Scott Gaddis. That exhibit shows no record of Scott Gaddis purchasing the Honda.

16. Scott was supposed to obtain the permission of either Bill or Steve to purchase the Honda on his account, however he did not obtain anyone's permission for the purchase.

17. Plaintiff's Exhibit 5, however, is a bill of sale from [the Dealership] to Garrett Gaddis for the Honda. That document was dated December 15, 2008, and is for the sum of Five Hundred Thirty Five ($535.00) dollars.

18. There was some dispute as to how much Garrett had paid toward the Honda, but the Court finds most credible that Garrett had given his father the sum of Two Hundred ($200.00) dollars towards the purchase of the Honda, and was to continue paying payments to his father, who then was to pay the money to [the Dealership].

19. Garrett had, at times, parked the Honda on the lot of [the Dealership], which was located next door to his father's residence.

20. Garrett had also used other [Dealership] cars for his job as a pizza delivery driver. Although Garrett alleges that he did not have permission to use those cars, he clearly had access to the keys to those cars and it happened on multiple occasions.

21. [The Dealership] did not stop Garrett from using the cars for pizza delivery.

22. Steve Gaddis discovered cars missing on multiple occasions, and he would retrieve the car from Garrett. On one occasion he found Garrett actually driving one of the cars. [The Dealership] never made a police report.

23. Once Garrett started driving the Honda, his behavior was unacceptable to his father. He was missing school, spending most of his time with his girlfriend, and not coming home.

24. Scott then took the car and keys away from Garrett and parked the car back on the [Dealership] lot. In taking such action, Scott was acting as Garrett's father, not as an agent of the dealership.

25. Garrett took the car and keys to the car on January 29, 2009, and drove the Honda when he collided with Edward Foster.

26. Subsequent to the accident, the Honda was taken to an auto auction and sold for One Thousand Four Hundred Sixty five ($1,465.00) dollars and that money was paid to [the Dealership].

6

Neither Garrett nor his father was given any of that money, even though Garrett allegedly owed the dealership only three hundred thirty five ($335.00) dollars toward the balance of the purchase price.

27. The Court heard no credible evidence that [the Dealership] paid the sales tax to the State of Indiana on the Honda.

28. [The Dealership] did, however, provide a copy of the Temporary Plate Log (Plaintiff's exhibit 6) showing that a temporary plate was issued to Garrett Gaddis on 12/15/08 for the Honda.

29. The title to the Honda, however, (Defendant's exhibit F) never lists Garrett Gaddis as an owner. The title provides that Bill Gaddis Chrysler Plymouth sold the vehicle to Bud's Auto Sales on February 2009.

30. The Court is left to piece these puzzle pieces together.

31. The Court finds most credible the evidence that [the Dealership] still owned the 1996 Honda. In drawing that conclusion, the Court relies on the title of the vehicle which never shows Garrett Gaddis as an owner of the car, the [Dealership] account statement in Scott Gaddis' name which never shows that he made arrangements for the sale of the Honda to Garrett and the proceeds check of One thousand four hundred sixty-nine ($1469.00) [sic] dollars being paid to [the Dealership] with no amount being paid to Garrett or his father. The Court finds that the overall picture of this case is that Garrett Gaddis was a spoiled grandchild, and that the adults involved here, Bill, Steve and Scott all indulged Garrett and his misbehavior instead of setting strict boundaries with him. Once the accident happened, [the Dealership] cooperated with the insurance company and covered up their bad acts.

32. The Court now turns to the question of permission to drive the car.

33. Steve knew that Garrett was reckless and purportedly did everything he could to keep Garrett off of the property. Steve knew that Garrett had used multiple cars off of the lot. [The Dealership] never did anything to lock the keys up from Garrett, which, in effect, allowed him to continue using the cars.

34. By allowing Garrett to get away with "borrowing" cars off of the lot to drive for work, play or whatever his purposes, [the Dealership] gave Garrett their implied permission to drive their cars.

35. Garrett didn't "believe" he needed to get permission to drive the Honda because he says that he owned the car. The Court does not believe that Garrett owned it, but does believe that Garrett

didn't think he needed anyone's permission, based upon his past behavior.

Wherefore, the Court finds that Plaintiff's Motion for Declaratory Judgment should be and is DENIED. Costs vs. Plaintiff.

Appellant's App. pp. 16-18. The parties are in agreement that the effect of the trial court's denial of Auto-Owners's motion for declaratory judgment is entry of judgment in favor of Foster.

## DISCUSSION AND DECISION

**Whether the Trial Court Erred in Entering Judgment in Favor of Foster**

There is no dispute that if Garrett owned the Accord at the time of the accident, there is no coverage. Auto-Owners contends that the trial court's finding that the Dealership owned the Accord on January 29, 2009, is clearly erroneous. The trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52.

> When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. "First, it must determine whether the evidence supports the trial court's findings of fact; second, it must determine whether those findings of fact support the trial court's conclusions of law." *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 158 (Ind. 1994) (citation omitted). Findings will only be set aside if they are clearly erroneous. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id.* (citation omitted). A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *State v. Van Cleave*, 674 N.E.2d 1293, 1296 (Ind. 1996), *reh'g granted in part*, 681 N.E.2d 181 (Ind. 1997). In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.* at 1295.

*Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997).

## I. Whether the Trial Court Erred in Concluding that the Dealership Owned the Accord

8

Auto-Owners contends that the trial court's conclusion that the Dealership owned the Accord at the time of the accident is contrary to law.

> In insurance coverage cases, where an automobile dealer sells a vehicle but has not yet transferred the certificate of title to the buyer, ownership of a newly-purchased vehicle is established when the evidence shows that the parties have completed the sale transaction. *Ellis v. Weger* (1990), Ind. App., 550 N.E.2d 1347, 1351; *Royal Indemnity Insurance Co. v. Shue* (1962), 134 Ind. App. 322, 327, 182 N.E.2d 796, 799, *trans. denied.* Our courts have recognized several indicia of ownership of an automobile which are considered evidence of a completed sale, including: (1) whether the parties have executed the sales contract; (2) whether the buyer has remitted a down payment; (3) whether the sale was conditioned upon financing and whether financing was obtained; (4) whether the vehicle bears an interim license plate; and (5) whether title has passed from the seller to the buyer. *See Haskell v. Peterson Pontiac GMC Trucks* (1993), Ind. App., 609 N.E.2d 1160, 1164; *Weger v. Lawrence* (1991), Ind. App., 575 N.E.2d 659, 662, *trans. denied*; *Pekin Insurance Co. v. Charlie Rowe Chevrolet, Inc.* (1990), Ind. App., 556 N.E.2d 1367, 1370; *Ellis v. Weger*, 550 N.E.2d at 1352.

*O'Donnell v. Am. Employers Ins. Co.*, 622 N.E.2d 570, 573 (Ind. Ct. App. 1993) (footnote omitted).

We conclude that, despite the execution of a bill of sale and the issuance of a temporary plate, the trial court's determination that the Dealership still owned the Accord is not clearly erroneous. The trial court cited three facts to support its conclusion that the Dealership owned the Accord at the time of the accident: (1) title was never transferred to Garrett, (2) the Dealership's records regarding Scott's employee account do not reflect the sale, and (3) the money from the auction was retained by the Dealership, not Garrett. We further note the trial court's findings that (1) there was no credible evidence that the Dealership paid sales tax for the Accord, (2) Garrett occasionally parked the Accord at

9

the Dealership, and (3) Scott parked the Accord at the Dealership after confiscating its keys from Garrett.

Most compelling is the fact that the Dealership took possession of the Accord after the accident, sold it at auction, and retained all of the proceeds, even though they far exceeded the balance supposedly owed by Garrett. Had the Accord belonged to Garrett (as far as the Dealership was concerned), the excess would have been returned to Garrett. The circumstances surrounding the Accord's sale strongly imply that the Dealership never really abandoned its ownership interest. Add to this the facts that there is no evidence that the Dealership paid sales tax on the Accord, did not record the purported sale on certain internal documents, allowed Garrett and Scott to park the Accord on Dealership property, and never transferred title, and the evidence as a whole supports the trial court's judgment.

We acknowledge Indiana precedent holding that, at least in some cases, the failure to immediately transfer title does not preclude a completed sale. In both *Ellis*, 550 N.E.2d at 1352, and *Shue*, 134 Ind. App. at 322, 182 N.E.2d at 796, we concluded that there was a completed sale despite no transfer of title. Those cases, however, do not control here. In *Ellis*, the purchaser was involved in an accident fewer than seven hours after leaving the dealer with his car, before there was a reasonable opportunity to transfer title. *Ellis*, 550 N.E.2d at 1348. In *Shue*, transfer of title to the car was delayed because the previous owners were in the midst of a divorce, and the dealership had tried to contact the owner to transfer title but was unsuccessful. *Shue*, 134 Ind. App. at 325, 182 N.E.2d at 798. Here, in contrast, there is no good reason offered for why transfer of title to

10

Garrett should have been delayed for over a month. In essence, Auto-Owners is asking this court to reweigh the credibility of the evidence, which we will not do. *See Yanoff*, 688 N.E.2d at 1262. Under the circumstances of this case, we conclude that the record supports the trial court's determination that the Dealership retained ownership of the Accord.

**II. Whether the Trial Court Erred in Concluding that Garrett was Driving the Accord with the Dealership's Permission**

Auto-Owners also contends that the trial court's conclusion that Garrett had permission to drive the Accord is clearly erroneous. Again, we must disagree. The Dealership's history of allowing Garrett access to its vehicles supports a reasonable conclusion that he was driving the Accord with permission. Garrett had borrowed cars from the Dealership several times, but no police report had ever been filed. In addition, the Dealership never did anything to restrict Garrett's access to the keys to its cars, which, as the trial court found, allowed him to keep driving them. Although Garrett testified that he never received explicit permission to borrow cars from the Dealership, we conclude that such was not necessary. Garrett's pattern of unchecked behavior would lead a reasonable person to conclude that such behavior was, at the very least, tolerated. Auto-Owners points to testimony from Steve that he did everything he could to keep Garrett off of the Dealership's property, but the trial court was free to disregard this evidence, and did. Again, Auto-Owners is asking us to reweigh the evidence, which we will not do. *See id.* The trial court's finding that Garrett had permission to drive the Accord at the time of the accident is not clearly erroneous.

We affirm the judgment of the trial court.

BARNES, J., and BROWN, J., concur.